CHESNEY v. TVA                                        No. 3:09-CV-09

## TVA'S SUPPLEMENTAL BRIEF FOLLOWING THE DECEMBER 14, 2010 HEARING ON CLASS CERTIFICATION

Pursuant to the Court's invitation at the December 14, 2010 hearing on class certification, TVA hereby submits this supplemental brief addressing the following points covering matters raised in the *Chesney* Plaintiffs' reply brief: (1) trial plan concepts, (2) the alleged "single incident" nature of Plaintiffs' liability claims, (3) the new Kilpatrick Declaration, and (4) the lack of classwide proof regarding the alleged presence of fly ash.

## I. TRIAL PLAN CONCEPTS

### A. The Chesney Plaintiffs' Proposed Trial Plan Is Really No "Plan" At All.

The *Chesney* Plaintiffs' trial proposal fails to satisfy the rigorous requirements of Rule 23(b)(3), and, if anything, only further underscores the manageability problems that pervade the proposed class structures and preclude their certification. Essentially, the *Chesney* Plaintiffs offer the Court nothing more than a smorgasbord of options, none of which actually is endorsed or described in sufficient detail to allow for a determination of its potential applicability *in this litigation.* In fact, the options are contradictory.

Thus, the *Chesney* Plaintiffs initially suggest "a single trial," where so-called "liability proof" against the Defendants would be "tried in one proceeding." (PageID 13637-38.) Plaintiffs claim such a trial could determine "both liability and, potentially, classwide property damages as well," including "specific causation . . . for the class." (PageID 13638.) Plaintiffs never attempt, however, to describe how specific causation could possibly be established on a classwide basis given the particular claims – and the variety of properties, claims, and evidence –

1

at issue here. This same failing undermines *Chesney* Plaintiffs' assertion that their proceeding can be undertaken *simultaneously* with a "bellwether trial" of the claims of one or more Plaintiffs in the multi-party individual *Auchard* and/or *Raymond* and/or *Scofield* actions, where plaintiffs chose individual litigation and allege a host of unique claims.[1]

The *Chesney* Plaintiffs also argue that such a trial plan would effectively resolve all class claims, leaving for individual determination in subsequent trials issues of specific causation and damages on individual Plaintiffs' claims for emotional distress, personal injury, medical monitoring, and business losses – together with property damage claims for Plaintiffs outside the proposed class areas. Yet, Plaintiffs fail to acknowledge that the very existence of some 400 individual Plaintiffs in 55 cases weighs strongly against a finding that class action is the superior method of adjudication; and that a "trial" of the type Plaintiffs suggest is rife with substantive and procedural problems that render it improper. For example, Plaintiffs do not discuss the evidentiary complexities involved with melding class claims and individual claims in one proceeding. Nor do they grapple with the difficulties posed by having to assert varying legal theories and factual allegations against three differently situated Defendants. Finally, the problematic issues of opt outs and class notice go completely unaddressed.

As if this "single proceeding" were not convoluted enough, *Chesney* Plaintiffs further suggest that instead of the Court's determining compensatory damages in that "single proceeding," the task could be carried out by a Rule 53 special master – presumably in *hundreds of additional individual proceedings*. (PageID 13640.) Plaintiffs themselves do not even attempt to explain the scope of responsibility that master would assume, what criteria the master

---

[1]     The *Auchard* Plaintiffs recently moved the Court to adopt a bellwether approach covering at least five categories of *Auchard* Plaintiffs which would not have preclusive effect. (*Auchard*, No. 3:09-cv-54, Doc. 195.) TVA will respond specifically to that motion on or before the due date of December 30.

2

would be considering (including whether the "amount of compensatory damages" is intended to refer to individual class members' damages), what criteria would be applied to determine claimed damages; or how such a procedure could be accomplished without resulting in an end run around Plaintiffs' burden of showing that common issues *predominate.*

Alternatively, *Chesney* Plaintiffs argue their claims could be tried in a bifurcated fashion, with "negligence and general causation" to be determined in Phase I, and "specific causation and damages in phase II." Plaintiffs do not explain how trying "negligence" would resolve any of their other claims (including nuisance and trespass); nor do they reveal how "negligence" can be tried (and liability determined) in a trial phase that will not include findings of specific causation or the fact of claimed damage, given that both are *prima facie* elements of a tort claim.

As further evidence of this disjointed approach, TVA notes that *Chesney* Plaintiffs offer still more variations on their phased trial proposal, suggesting (again without any clear explanation) the possibilities of "bifurcating liability and damage trials with *the same or different* juries," or decertifying the class after the liability trial and permitting individual class members to proceed to their own trials to prove alleged damages. (PageID 13641.) Plaintiffs even offer a half-hearted reprise of their request for issue certification, somewhat cryptically suggesting in a footnote that the Court would then "look to liability issues to determine predominance, and bifurcate liability and general causation from specific causation and damages." (PageID 13640-41.)

In the end, then, the *Chesney* Plaintiffs' trial plan amounts to little more than a litany of vague case management concepts. Plaintiffs never provide a feasible trial plan that would account for the interests and procedural concerns of all factions of Plaintiffs and Defendants and never supply any practical trial framework.

3

**B.      Alternative Methods Exist for Achieving Overall Litigation Efficiency.**

Although the class action device is inappropriate here for a multitude of reasons, at least one other procedural option can achieve the economies and efficiencies that actually are available given the context of this litigation.  Viewed as a whole, the only truly common issues potentially subject to trial in this litigation are limited to Defendants' conduct pertaining to the dike failure itself.  Specifically, with respect to the dike failure itself, these issues are whether there was a legal duty owed by Defendants, and, if so, whether that duty was breached, and, if so, whether the breach was a proximate cause of the dike failure.  In other words, the only truly common issues are whether actionable conduct on the part of TVA (and/or WorleyParsons Corporation, and/or Geosyntec Consultants, Inc.) factually and proximately caused the failure of the dike itself.

The further factual issues of whether the dike failure itself (as opposed to something else such as TVA's CERCLA response activities or TVA's historical activities at Kingston) caused injury-in-fact to specific individual Plaintiffs are not susceptible to mass or representative determination.  This is so because the remaining potential factual issues all involve determinations which are unique to individual Plaintiffs in a vast geographic area (*e.g.*, whether the dike failure as opposed to something else caused allegedly excessive fly ash particles on a specific individual's property, the specific claimed injuries for each individual, and the amount of a specific individual's claimed damages).  Of course, the Court's rulings on the pending motions for summary judgment could dramatically narrow the scope of any triable issues and potentially eliminate the need for trial altogether.

Nevertheless, should the Court at this time desire to consider options other than the current trial plans established in its existing scheduling orders, TVA would encourage the Court to consider a consolidation, outside of the context of Rule 23 and pursuant to Rule 42, of all 55

4

4286479

cases for the purpose of conducting a trial on the narrowly-focused questions of duty, breach, and causation of the dike failure. Such a plan would ensure efficiencies in the Court's management of its ash spill litigation docket and be consistent with the Sixth Circuit's adjudication in *Sterling v. Velsicol*, 855 F.2d 1188, 1200 (6th Cir. 1988) ("[It is] the responsibility of each individual plaintiff to show that his or her specific injuries or damages were proximately caused by ingestion or otherwise using the contaminated water. We cannot emphasize this point strongly enough because generalized proofs will not suffice to prove individual damages.").

As compared to Plaintiffs' expansive Rule 23 proposal, TVA's Rule 42 approach allows for more narrowly-tailored, cost effective litigation. Also, a consolidated trial under Rule 42 would avoid the mandatory requirements of notice and opt outs under Rule 23. Finally, following Rule 42 resolution of the duty, breach, and dike-failure causation issue, the parties and the Court, if necessary, can convene to consider how to deal with any issues that may remain.

## II. THE ALLEGED "SINGLE INCIDENT" NATURE OF THE PLAINTIFFS' LIABILITY CLAIMS

The *Chesney* Plaintiffs argue that class certification is particularly appropriate "for cases like this one, arising from a single-incident mass disaster[]," and the *Mays* reply brief similarly begins by characterizing this litigation as involving a "common cause or disaster." (*Chesney* PageID 127565; *Mays* PageID 3394.) The crux of this argument stems from the undisputed fact the containment dike collapsed and the ash spill occurred in the early morning hours of December 22, 2008. However, Plaintiffs' proposed class actions are not about a set of plaintiffs or a geographic area indisputably impacted by the physical flow of ash sludge in the early morning hours of December 22, 2008. In other words, these cases bear little resemblance to a mass accident like the Hyatt skywalk collapse case or a train derailment accident in which the

5

impacted persons or areas (and general causation) can be easily ascertained by virtue of the location of the accident. *See Sala v. National R.R. Passenger Corp.*, 120 F.R.D. 494, 499-500 (E.D. Pa. 1988) (train derailment); *In re Fed. Skywalk Cases*, 93 F.R.D. 415, 421-25 (W.D. Mo. 1982) (collapse of pedestrian bridge), *vacated on other grounds*, 680 F.2d 1175, 1182 (8th Cir. 1982).

Instead, the proposed *Chesney* and *Mays* class actions focus exclusively on lands onto which ash sludge never flowed. In fact, it is undisputed that TVA has purchased the properties onto which ash sludge actually flowed as well as numerous other properties in the vicinity of the spill and the ongoing response work. Plaintiffs have yet to offer any evidence that ash from the spill ever reached a single property in their vast proposed class geographic areas, let alone reached each and every such property.[2] Nor do they offer any scientific evidence that ash from the spill poses any future risk to their properties.[3] As a result, the issues of specific causation loom large in the *Chesney* litigation – is there an actionable level of fly ash on a given property? If so, when did it get there (pre- or post-spill), how did it get there (from discretionary or non-discretionary conduct), and what risk (if any) does it pose?[4] No uniform, classwide proof can provide the answer to these questions.

---

[2] The core of Plaintiffs' lawsuit hinges on whether fly ash from the dike failure caused material amounts of fly ash to be located throughout the entire proposed class areas. Plaintiffs' lawsuit is not about the historical presence of fly ash in the area or the presence of fly ash from non-actionable conduct. Significantly, neither Dr. Millette nor any other expert ever opines that the ash particles found from sampling some properties – which samples had ash amounts ranging from nonexistence to 3% at most – came from the dike failure.

[3] The only evidence on this front comes from the Tennessee Department of Health's Public Health Assessment and Oak Ridge Associated Universities' Health Assessment.

[4] In contrast, Plaintiff Mays does not contend that any fly ash reached his property as a result of the spill. Indeed, Mays' counsel noted at the class certification hearing with regard to such proof of trespass "you're going to have to prove I think that the material actually wound up on your property. And I think that's almost impossible to do." (Hrg. Tr. at 10, Dec. 14, 2010.) Instead, the *Mays* litigation is premised on the assertion that a nuisance may exist even without

Thus, this is not a "mass tort accident" in which "the factual and legal issues of a defendant's liability do not differ dramatically from one plaintiff to the next." *Sterling v. Velsicol Chem. Corp.*, 855 F.2d 1188, 1197 (6th Cir. 1988). Rather, if *Sterling* is to serve as the guidepost Plaintiffs suggest, the following language should govern:

> In complex, mass, toxic tort accidents, where no one set of operative facts establishes liability, no single proximate cause equally applies to each potential class member and each Defendant, and individual issues outnumber common issues, the district court should properly question the appropriateness of a class action for resolving the controversy.

*Id*. at 1196-97 (emphasis added). Simply put, Plaintiffs' proposed class areas bear only a superficial correlation to the event of the ash spill.[5]

## III.    KILPATRICK'S REPLY DECLARATION

The *Chesney* Plaintiffs' reply included a new 29-page submission from their real estate appraiser, John A. Kilpatrick. As Kilpatrick already has acknowledged (*Chesney* PageID 5724, 5727), he relied upon Plaintiffs' counsel to provide him with class definitions – that is, his work does not purport to provide any rationale for the boundaries of the *Chesney* proposed classes. In addition, Kilpatrick's new Declaration fails to resolve any of the fundamental problems with his class-related expert opinions.

First, Kilpatrick has not performed his proposed hedonic regression analysis. As a result, he can offer no concrete evidence that his proposed model is a viable method for calculating classwide diminution-in-value damages in this case.[6] Indeed, Kilpatrick has *never* executed such

---

any physical or sensory invasion of property, a legal point challenged by TVA's pending motion for summary judgment on grounds of no causation.

[5]    To support their class contentions, the *Chesney* plaintiffs attach a chart listing environmental class action cases. (*Chesney* PageID 12742-55.) These cases, however, are either off-point or obviously distinguishable. (Addendum.)

[6]    Kilpatrick's hedonic regression analysis is an attempt by the *Chesney* Plaintiffs to demonstrate classwide diminution in property value proof, presumably associated with a

4286479

an analysis and had it peer-reviewed or accepted by a court as a basis for actually awarding

damages at trial. As he testified during his June 2010 deposition in *Benefield v. Int'l Paper Co.*,

No. 2:09-cv-232-WHA (M.D. Ala.):

> Q: Dr. Kilpatrick, is it correct that you have never performed a mass appraisal or
> hedonic regression analysis to estimate the effects of environmental
> contamination on property values and had the results of that analysis published in
> a peer-reviewed journal?
>
> A: No, I haven't.
>
> Q: Have you ever performed a mass appraisal analysis or hedonic regression
> analysis to estimate the effects of environmental contamination on property values
> and had the results of that analysis accepted by a court through trial?
>
> A: Hmm. Hmm. I can't recall one. No.

(Kilpatrick Dep. at 184:3-16, June 29, 2010; cited pages attached.)

At this stage in the litigation, mere promises of future work are not enough. *Compare*

*Hydrogen Peroxide Anti. Litig.*, 552 F.3d 305, 315, 321-22 (reversing class certification because

the district court "had not require[d] plaintiffs to show at the certification stage that [their

proposed statistical regression analysis] would work.") *with* Kilpatrick Reply Decl. at ¶¶ 11, 15,

28, 49, PageID 13692-93, 13695, 13701 (referring to work he proposes performing during the

"merits" stage of *Chesney*).

Not only has Kilpatrick failed to run his mathematical model, he refuses to share his

proposed formula, or even his list of proposed variables. His entire hedonic regression

discussion remains at an abstract level devoid of particulars. By shielding his input criteria,

---

permanent nuisance claim. The *Mays* case asserts a claim solely for private temporary nuisance,
but the *Mays* proposed class as amended overlaps a large portion of the *Chesney* Emory, Central,
and Southern proposed classes. (*See* Hrg. Tr. at 7, Dec. 14, 2010 ("I will be representing the
*Mays* class concerning our single cause of action, which is temporary nuisance . . ..").)
Notwithstanding this conflict in theories, no Plaintiff suggests a hedonic regression analysis can
be used to calculate any claimed damages for interference with use and enjoyment of property –
which are inherently highly individualized.

Kilpatrick deprives both Defendants and the Court of the ability to examine fairly Plaintiffs'
proposed classwide damages solution. For example, without the Kilpatrick inputs and formula,
the outputs from the model cannot be contrasted against real world sales data. As it stands,
whether the model could ever be reasonably accurate is wholly speculative, and, indeed, suspect
based on his refusal to provide information.

Finally, not only does Kilpatrick fail to share his proposed formula for this litigation, he
has failed to produce *any* reliance materials. As noted in TVA's motion to compel and
supplemental class opposition brief, Kilpatrick has not produced even a single page of existing
reliance materials in this case. (PageID 12430-31.) This disregard for the rules of discovery,
coupled with the late hour of class certification proceedings, justifies, at a minimum, drawing the
negative inference that the withheld materials would not be helpful to Plaintiffs.

**IV. THE *CHESNEY* PLAINTIFFS HAVE FAILED TO PRODUCE ANY EVIDENCE SHOWING THE EXISTENCE OF CLASSWIDE PROOF AS TO THE ALLEGED PRESENCE OF FLY ASH.**

**A. The Chesney Plaintiffs' Flawed Sampling and Testing Efforts**

Following the December 14, 2010 class certification hearing, Plaintiffs filed yet another
declaration, that of Kenneth S. Garza. This declaration provides no cure for the inherent
problems with Plaintiffs' ad hoc sampling.[7] Thus, the declaration does not controvert TVA's
points that:

> 1. The sampling program lacked any formal plan and was no more than an attempt to produce results skewed in favor of Plaintiffs.

---

[7] The American Society for Testing and Materials (ASTM) requires that "sufficient numbers of samples should be obtained as directed by a sampling plan" before a conclusion can be deemed valid. (ASTM Standard Practice for Collection of Settled Dust Samples Using Wipe Sampling Methods for Subsequent Determination of Metals sec. 1.2; produced by Plaintiffs from Gobbell Hays files on December 6, 2010.) In other words, without a plan telling when, how, and why samples were chosen which could validate the process, the Plaintiffs' approach and selective reporting cannot demonstrate a material fly ash encroachment throughout the proposed class boundaries.

4286479

2. The sampling was uncontrolled with respect to:

    a. variables relating to the period of exposure for sampled surfaces,
    b. weather conditions,
    c. human activity,
    d. selection of sample locations (indoor/outdoor; dusty/clean),
    e. selection of sources sampled (wood, metal, concrete, plastic, etc.), and
    f. scope (limited area and number).

More specifically, as to the Garza declaration, a review of the two maps sponsored by Mr. Garza shows they:

1. Fail to report 21 samples taken and analyzed in March and June of 2009 within the boundaries of the Proposed Inland and Emory Waterfront Classes (Page ID 12439),

2. Report 8 samples taken and analyzed in 2010 while concealing the results of 20 samples, including all nondetects (Page ID 5616-18), and

3. Depict only select results and conceal the existence of other sampling results at the same locations.

Regardless, even with their ad hoc approach, their result-based efforts, their disregard of the unfavorable withheld results, and their decision to report only a fraction of the sampling information collected since March 2009, Plaintiffs have been unable to show (1) any classwide correlation to source, (2) any classwide correlation to event, or (3) any classwide correlation to non-discretionary conduct. Nor has any Plaintiffs' expert opined that the presence of trace amounts of fly ash reported by Plaintiffs resulted from the dike failure or from non-discretionary conduct. In sum, Plaintiffs' efforts, at best, have simply reported only a range of variability between nondetects and trace levels of fly ash on a few and carefully selected properties.

### B. The *Chesney* Plaintiffs' Claims Regarding Ubiquitous Fly Ash

The *Chesney* Plaintiffs assert "[a]ll class members have been affected . . . in the same basic ways" (PageID 5376) and further claim they can present "common proof" of property damage and the "types of harm" (PageID 12580) because "floating coal ash" or cenospheres are "ubiquitous" (PageID 6084) and because coal ash "has settled on the riverbed" at locations "in

10

front of [the class members'] homes" (PageID 5377). In making this argument, Plaintiffs ignore that they are not riparian owners with any legally protectable interest in the Reservoir as well as the complementary preclusionary effect of the Tennessee Recreational Use Act on their claims.

In addition to these legal barriers, the factual evidence Plaintiffs have proffered shows only that there can be no "common proof" for any of the purported classes as to the presence of coal ash. Thus, far from being "ubiquitous," the claimed presence of cenospheres, as shown by Plaintiffs' evidence, varies greatly from "heavy" to "very light" within the Reservoir and each of Plaintiffs' proposed classes. (PageID 6471; Page ID 6489-97; PageID 6499-6513.) Moreover, as with their sampling efforts, Plaintiffs discuss only those results which appear to favor Plaintiffs. Here, Plaintiffs' maps of observed cenosphere locations fail to reveal that no cenospheres were found at more than half of the thousands of locations where observations were made. (Produced by Plaintiffs at TVK959321-TVK962041.) Thus, of the approximately 2,700 datapoint locations, 1656 (sixty percent or so) showed no cenospheres. (Thomas Patrick O'Connor Deposition, September 15, 2010, Ex. 399.)

As to ash deposited on the riverbed, the *Chesney* Plaintiffs' evidence shows, as one might expect, that ash was not deposited in a uniform fashion throughout the Reservoir. There were many locations where ash was not present or where only a trace of ash was found. (*Chesney* PageID 5706-12.) Moreover, in many places where ash was detected, it has mixed with native sediments and has been subsequently covered by a layer of native sediments. (*Id.*) Finally, to date, no ash has been found below Tennessee River mile marker 559.8, and Plaintiffs' proposed classes extend an additional thirty miles or so southward to Watts Bar Dam (mile marker 530). (*Chesney* PageID 5706.) Accordingly, even were Plaintiffs' claims not precluded by their lack of a property interest in the Reservoir waters and the Tennessee Recreational Use Statute, any

proof of specific causation depends on showing the presence or absence of coal ash at each class member's property and cannot be premised on some assumption of classwide exposure.

## V.     CONCLUSION

In the final analysis, neither Plaintiffs' arguments nor their case citations (1) support their novel and undeveloped "unitary trial plan," (2) establish that this case should be considered a "single incident" for the purposes of this Court's class certification analysis, (3) redeem the deficient Kilpatrick declaration, or (4) remedy the insurmountable problem facing Plaintiffs – that they have not, and cannot, establish as a basis for class certification the material presence of fly ash on *their properties* as a result of the dike failure.

Respectfully submitted by counsel for Defendant TVA,

Edwin W. Small (TN BPR 012347)
*Assistant General Counsel*
Peter K. Shea (TN BPR 005573)
Brent R. Marquand (TN BPR 004717)
James S. Chase (TN BPR 020578)
David D. Ayliffe (TN BPR 024297)
Elizabeth A. Ward (TN BPR 026648)
TVA GENERAL COUNSEL'S OFFICE
400 West Summit Hill Drive
Knoxville, TN 37902-1401
Telephone: 865-632-3021

*s/Mark D. Anstoetter*
Mark D. Anstoetter  (MO Bar #47638)
John K. Sherk (MO Bar #35963)
SHOOK, HARDY & BACON LLP
2555 Grand Boulevard
Kansas City, MO 64108-2613
Telephone: 816-474-6550

4286479

## CERTIFICATE OF SERVICE

      I hereby certify that the foregoing document was filed electronically through the Court's ECF system on the date shown in the document's ECF footer.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties as indicated on the electronic filing receipt.  Parties may access this filing through the Court's ECF system.

_s/Mark D. Anstoetter_
Attorney for Defendant TVA

<u>**ADDENDUM**</u>

**TVA's Analysis of *Chesney* Plaintiffs' Chart of Cases**

The *Chesney* Plaintiffs attach a chart to their Reply (Exhibit 22, PageID 12742-55) listing 30 decisions certifying environmental class actions. Plaintiffs' cases are unpersuasive for a host of reasons.

➢ One case, *Day v. NLO, Inc.*, 144 F.R.D. 330 (S.D. Ohio 1992), is a workplace exposure case that has nothing to do with allegations of property contamination.

➢ Two cases Plaintiffs rely upon *Rockwell Int'l Corporation*, 151 F.R.D. 378 (D. Colo. 1993), and *Amerada Hess Corp. v. Garza*, 973 S.W.2d 667 (Tex. Ct. App. 1996), have been reversed or subsequently called into question. *See Cook v. Rockwell Int'l Corp.*, 618 F.3d 1127, 1134, 1141-42; 1147-49 (10th Cir. 2010) (reversing class certification because plaintiffs were impermissibly relieved from proving the presence of contamination on each absent class member's property); *Southwestern Refining Co., Inc. v. Bernal*, 22 S.W.3d 425, 434-35 (Tex. 2000) (criticizing *Amerada* for improperly adopting a "certify now and worry later" approach to class certification).

➢ *Sher v. Raytheon Co.*, 261 F.R.D. 651 (M.D. Fla. 2009), is currently under advisement by the Eleventh Circuit. One issue presented in that appeal, argued on Sept. 15, 2010, is "[w]hether the district court erred by certifying a class without resolving a challenge to the testimony of the very experts on whose opinions plaintiffs relied to justify class certification." *See Sher v. Raytheon Co.*, 09-15798-EE, Br. of Appellant, at 4 (excerpts attached). This is of particular note because the *Chesney* Plaintiffs' Reply relies heavily on the district court opinion in *Sher* for the proposition that the Court should not analyze class expert offerings at the class certification stage. (*Chesney* PageID 12588.) TVA's prior briefing and

1

oral presentation highlighted the wall of authority to the contrary that has developed at the appellate level on this issue in the First, Second, Third, Seventh, Eighth, and Ninth Circuits.[8]

➤ Plaintiffs rely on *Gintis*, noting that Justice Souter issued the opinion reversing a denial of class certification. Justice Souter, however, did not find class certification was appropriate. Rather, he found that the district court had failed to adequately consider the request for class certification, and he ordered reconsideration on remand. 596 F.3d at 65-68.

➤ Many cases on Plaintiffs' list involved situations in which a government or third-party report previously had concluded the proposed class area faced a risk of significant contamination. *E.g.*, *Sterling*, 855 F.2d at 1192-93; *Collins v. Olin Corp.*, 248 F.R.D. 95, 99 (D.Conn. 2008); *Janes v*, 2007 WL 1362469 at *3; *LeClercq v. Lockformer Co.*, No. 00-C-7164, 2001 WL 199840 (N.D. Ill. Feb. 28, 2001); *Johnson v. Orleans Parish Sch. Ed.*, 790 So. 2d 734, 739, 749 (La. Ct. App. 2001). In contrast, here two studies (the TDH's Public Health Assessment and the ORAU's Surveillance Program) have concluded the ash from the spill poses no potential risk.

➤ Plaintiffs rely on five cases involving plumes of alleged contamination. *See Gates v. Rohm & Hass Co.*, 248 F.R.D. 434, 437 (E.D. Pa. 2008); *Janes v. Ciba-Geigy Corp.*, No. L-1669-01, 2007 WL 1362469, *4 (N.J. Ct. App. May 10, 2007); *Muniz v. Rexnord Corp.*, No. 04-C-2405, 2005 U.S. Dist. LEXIS 10472, *9 (N.D. Ill. Feb. 10, 2005); *Bentley v. Honeywell Intern., Inc.*, 223 F.R.D. 471, 473, n.2 (S.D. Ohio. 2004); *O'Connor v. Boeing N. Am., Inc.*, 184 F.R.D. 311, 317 (C.D. Cal. 1998). In contrast, there is no dispute that TVA

---

[8]    *See American Honda Motor Co., Inc. v. Allen*, 600 F.3d 813, 815 (7th Cir. 2010); *Dukes v. Wal-Mart Stores, Inc.*, 603 F.3d 571, 605 (9th Cir.), *cert. granted in part on other grounds*, -- S. Ct. -- , 2010 WL 3358931 (2010); *In re Hydrogen Peroxide Anti. Litig.*, 552 F.3d 305, 323 (3d Cir. 2009); *In re New Motor Vehicles Canada Export Anti. Litig.*, 522 F3d 6, 29 (1st Cir. 2008); *In re Initial Public Offerings Sec. Litig.*, 471 F.3d 24, 41 (2d Cir. 2006); *Blades v. Monsanto Co.*, 400 F.3d 562, 569-70, 575 (8th Cir. 2005).

2

already owned or subsequently purchased all lands onto which ash sludge from the spill flowed. Moreover, none of Plaintiffs' proposed experts conclude ash particles *from the spill* reached any putative class member's property.

> ➤ Two of the cases on Plaintiffs' chart were settlement class actions, meaning the defendants themselves advocated for class certification. *See Gates*, 248 F.R.D. at 445; *Flournoy*, 239 F.R.D. at 700.

> ➤ Several of the cases lack any real class certification analysis. The entire predominance analysis in *Bates* is limited to a single sentence. 132 F.R.D. at 164. Two other cases cited by Plaintiffs provide no substantive class certification analysis. *See Janes*, 2007 WL 1362469, *18 (limiting its discussion affirming class certification to one sentence); *In re Shell Oil Refinery*, 136 F.R.D. 588, 590 (E.D. La. 1991) (focusing on trial plan issues in an already-certified class action). In a third case, *Marr v. WMX Tech., Inc.*, 711 A.2d 700, 701 (Conn. 1998), the defendant only contested certification of an unfair practices claim (not the nuisance claims), so its certification analysis likewise offers no substantive insight here.

3